**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| MR Access Inc.,<br><br>Plaintiff,<br><br>v.<br><br>Koninklijke Philips N.V. and Philips Medical Systems Nederland B.V.<br><br>Defendants. | Civil Action No. 2:26-cv-881<br><br>JURY TRIAL DEMANDED |

**COMPLAINT FOR PATENT INFRINGEMENT**

Plaintiff MR Access Inc. ("MR Access"), for its Complaint against Defendants Koninklijke Philips N.V. ("Koninklijke Philips"), and Philips Medical Systems Nederland B.V. ("Philips Medical") (collectively, "Defendants" or "Philips"), alleges as follows:

**NATURE OF THE ACTION**

1. This is a civil action for infringement of United States Patent Nos. 6,969,992 (the "'992 Patent") and RE47,026 (the "'026 Patent") (collectively, the "Patents-in-Suit"), arising under the Patent Laws of the United States, 35 U.S.C. §§ 271 et seq.

**THE PARTIES**

2. Plaintiff MR Access is a corporation organized and existing under the laws of the State of Delaware.

3. MR Access is the exclusive licensee of all substantial rights and interest in the Patents-in-Suit, including the right to bring this suit for injunctive relief and to recover damages for any

current or past infringement of the Patents-in-Suit and the right to exclusively control this lawsuit.

4. MR Access was founded by MRI scientists, engineers, and radiologists with the goal of expanding access to MRI technology. Despite its clinical importance, access to MRI remains severely limited worldwide. Approximately 70% of the global population lacks access to MRI due to the high costs of equipment, installation, and maintenance, as well as the need for specialized facilities and trained radiologists. These limitations result in delayed diagnoses, preventable morbidity and mortality, and reduced quality of life for millions of patients. By leveraging the technological advancements disclosed in the Patents-in-Suit, MR Access aims to deliver MRI scans at a fraction of current costs, significantly expanding access to this critical diagnostic modality.

5. Defendant Koninklijke Philips is a public limited company organized and existing under the laws of the Netherlands, with its principal place of business at Prinses Irenestraat 59, 1077 WV Amsterdam, Netherlands, and having its registered office at High Tech Campus 52, 5656 AG Eindhoven, The Netherlands.

6. Defendant Philips Medical is a corporation organized and existing under the laws of the Netherlands, with its principal place of business at Veenpluis 6, 5684 PC Best, Noord-Brabant, Netherlands.

7. Defendants, themselves and/or through their subsidiaries and affiliates, make, use, and commercialize infringing MRI systems with MultiTransmit RF Technology and infringing coils for 3.0T and 7.0T systems that themselves infringe the Patents-in-Suit and which use infringing methods and processes for conducting magnetic resonance examinations.

## JURISDICTION AND VENUE

8. MR Access incorporates by reference paragraphs 1–7.

9. This action arises under the patent laws of the United States, including 35 U.S.C. §§ 271 et seq. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a).

10. This Court has personal jurisdiction over each Defendant because each Defendant has a continuous, systematic, and substantial presence within this judicial district. Each Defendant has purposefully availed itself of the privilege of conducting business activities in the State of Texas. Each Defendant has conducted and has done business in the State of Texas. Each Defendant has purposely availed itself of the rights and benefits of this forum such that each Defendant should reasonably anticipate suit in this District. For example, on information and belief, Philips, itself or through its subsidiaries, sells and/or leases MRI machines and systems to customers, such as imaging practices, hospitals, research facilities, and doctors' offices in this District. *See, e.g.*, Exs. 4–11. On information and belief, Philips further owns and licenses, including in this District, optional software, which Philips licenses to end users for a fee. Philips further supports and maintains its medical imaging systems in this District.

11. This Court further has personal jurisdiction over Philips, including Koninklijke Philips and Philips Medical, because Koninklijke Philips and Philips Medical, themselves or through their subsidiaries, affiliates, and agents, market, offer for sale, sell, import, and support infringing MRI systems and related software and hardware throughout the United States, including in Texas and this District. *See, e.g.*, Exs. 4–11.

12. Philips derives substantial revenue from sales of the infringing products and services in the State of Texas, and it has availed itself of the privilege of doing business with and in Texas.

13. On information and belief, Koninklijke Philips is the ultimate parent of the Philips group of companies. Koninklijke Philips directs and controls the activities of its subsidiaries with

respect to the accused MRI systems, including Philips Medical, and other subsidiaries in the United States. Koninklijke Philips' United States subsidiaries include Philips North America LLC, Philips Medical Systems (Cleveland), Inc., and Philips RS North America LLC. Ex. 15 at 109.

14. On information and belief, Koninklijke Philips acts in concert with its wholly owned subsidiaries, such as Philips Medical Systems (Cleveland), Inc., Philips North America LLC, and Philips RS North America LLC to deliver the accused infringing products into the Texas market through a stream of commerce. Koninklijke Philips' distribution channel—comprising its wholly owned subsidiaries—is arranged in a way that Koninklijke Philips knew, or reasonably could have foreseen, that a termination point of the channel was Texas, and specifically this District. The relationship between Philips and its subsidiaries was intended to distribute products into the United States, including to the state of Texas and to this District.

15. This Court further has personal jurisdiction over Philips Medical because, on information and belief, Philips Medical manufactures infringing MRI systems and itself or through its subsidiaries imports those infringing MRI systems into the United States, including into this District. For example, Philips Medical submitted a 510(k) premarket notification for Philips' MR 5300 and MR 7700 R11 MR Systems to sell those systems in the United States. Ex. 16 at 1. As a further example, Philips Medical submitted a 510(k) premarket notification for Philips' Ingenia Elition and MR 7700 MR Systems to sell those systems in the United States. Ex. 17 at 1. Philips Medical is listed as the manufacturer of those infringing MRI systems in those 510(k) submissions. Ex. 16 at 4; Ex. 17 at 4.

16. In those submissions, Philips Medical represented to the United States Food & Drug Administration that it designs and manufactures the accused MRI systems, and sought clearance

to distribute and sell those accused MRI systems in the United States. Philips Medical purposefully availed itself of the United States market with the intent that the accused MRI systems be sold, installed, distributed, and used in the United States, including in Texas and in this District.

17. On information and belief, Philips Medical and Koninklijke Philips employees travel to the United States to support the sale, distribution, service, and installation of the accused MRI systems.

18. Philips Medical further delivers its infringing MRI systems into the stream of commerce with the expectation that they will be purchased by consumers in Texas and specifically in this District. On information and belief, Koninklijke Philips and Philips Medical themselves or through their subsidiaries manufacture, import, use, offer to sell, and/or sell infringing products and services throughout the United States, including in this District knowing that they would be sold in this District and elsewhere in the United States. *See, e.g.*, Exs. 14, 16.

19. Koninklijke Philips and Philips Medical have further made, used, provided, supplied, distributed, sold, offered for sale, and/or imported 3T and 7T MRI systems and associated and compatible RF coils, which includes, among other things, the accused infringing devices, systems, and/or functionalities in the State of Texas, and Koninklijke Philips and Philips Medical continue to do so. Koninklijke Philips and Philips Medical support the development, distribution, and sale of the accused MRI systems into the United States and specifically into Texas.

20. This Court further has personal jurisdiction over Koninklijke Philips because, on information and belief, it purposefully markets, sells, imports, and supports the accused MRI systems in the United States and this District, itself and through its subsidiaries, including Philips

Medical. Philips purports to have a "U.S. location for the development and manufacturing of electromagnets for Magnetic Resonance Imaging (MRI) machines." Ex. 14 at 3. Philips has an established distribution channel into the State of Texas for the accused MRI systems.

21. On information and belief, Philips designed, manufactured, and manufactures the accused MRI systems for the United States market, including by configuring them to meet United States regulatory requirements, by preparing United States labeling, instructions for use, and documentation, and by establishing a distribution channel through which the accused MRI systems are imported, manufactured, sold, and distributed in the United States, including in this District.

22. Koninklijke Philips knowingly and intentionally offers for sale and sells through its website infringing MRI systems in the United States and in this District. For example, Philips' website page for its "Magnetic resonance imaging" at usa.philips.com/healthcare/diagnostic-imaging/magnetic-resonance-imaging, is available to access in Texas, bears the Koninklijke Philips logo, and bears a copyright owned by "Koninklijke Philips N.V." Ex. 3. On information and belief, Koninklijke Philips acts directly and/or through subsidiaries, affiliates, and agents—including Philips Medical—to design, manufacture, market, offer for sale, sell, import, and support the accused MRI systems and functionality in the United States. For example, in Koninklijke Philips' Form 20-F annual report for the fiscal year ended December 31, 2025, Koninklijke Philips stated that "Philips plans to expand its facilities in the U.S. and invest in additional manufacturing and R&D projects over the next several years to support the company's growth in the U.S." Ex. 15 at 44.

23. On information and belief, Philips recruits employees relevant to its magnetic resonance business to work at its physical location in this District. For example, Philips has advertised a job

for "Sales, Account Manager – Diagnostic Imaging" in "North Dallas, TX." Ex. 19 at 1. On information and belief, North Dallas includes counties in this District. Further, Philips promotes and requires that the advertised role "spans into East Texas." Ex. 19 at 2.

24. The role that Philips advertises for East Texas requires "promot[ing] the MR" product line, and to otherwise sell infringing MRI systems in this District, thereby committing acts of infringement in this District. *See, e.g.*, Ex. 19 at 1. The role further explains that it is a "field role," which "are more effectively done outside of the company's main facilities, ***generally at the customers' or suppliers' locations***." *Id.* at 2.

25. On information and belief, Philips' customers in this district include at least the following businesses: MRI Centers of Texas located in McKinney, TX, at 2156 N. Lake Forest Dr. Ste. 500, McKinney, TX 75071, which uses Philips MRI machines, including "the Philips 1.5T MRI." (*see* Exs. 7, 8, 9); East Texas Medical Center Tyler, also known as UT Health Tyler, located at 1000 S. Beckham Ave., Tyler, TX 75701, which uses Philips MRI machines, including the Philips Ingenia 3.0T (*see* Exs. 6, 39, 40); UT Health East Texas Physicians, located at 1325 N. Dickinson, Rusk, TX 75785, uses Philips MRI machines, including the Philips Ingenia 3.0T (*see* Ex. 11); and ETMC Carthage, also known as UT Health Carthage, located at 409 Cottage Rd., Carthage, TX 75633, which uses Philips MRI machines. (*see* Exs. 4, 41, 42).

26. On information and belief, Koninklijke Philips, itself or through its subsidiaries including Philips Medical, knowingly and intentionally directs its employees to be regularly and physically present in those customer or supplier locations in this District and to conduct the business of Philips at those locations. For example, on information and belief, employees such as sales account managers are regularly at customer or supplier locations in this District to sell and promote Philips' products, including the infringing MRI systems, associated coils, and specific

infringing features of the infringing MRI systems. Ex. 19 at 1. As another example, on information and belief, employees such as field service engineers are regularly at customer or supplier locations in this District to conduct Philips' service and maintenance business. *See* Exs. 10, 19, 22, 24. Philips intends that through its employees located physically in this District, it will sell and promote the infringing MRI systems, and maintain its presence in this District.

27. On information and belief, Philips assigns its employees, including account managers and engineers, geographic territories within this District, requires that employees reside within or adjacent to this District as part of their roles, and directs employees to work from home in this District when not at a customer site. *See* Ex. 19 at 2 (describing the role as a "field role" that is "most effectively done outside of the company's main facilities").

28. Philips further employs additional personnel in this District to regularly conduct business of Philips in this District and to conduct infringing activities in this District. *See* Ex. 20 (LinkedIn of Perry Pittman – General Account Manager – Richardson, TX), Ex. 21 (LinkedIn of Harsha C. – Senior Software Engineer – Celina, TX); Ex. 22 (Brad Kissling – District Service Leader – Bonham, TX); Ex. 23 (LinkedIn of Benson Babu – Global Product Reliability and Safety Risk Manager – McKinney, TX). For example, Brad Kissling of Bonham, Texas is responsible for "revenue growth," "operational analysis," and "field service." Ex. 22 at 1–2. Philips has also advertised Richardson TX as its base even for remote jobs. *See* Ex. 24 at 2.

29. On information and belief, Philips' employees are regularly employed at and maintain regular presences at the sites where the accused MRI systems reside. For example, in promoting its presence in East Texas, Philips quoted a customer stating that "I'm on a first name basis with all of the Philips service guys and they jump through hoops to quickly address any equipment

issues. It's almost like they're our extended employee family. It was a huge factor in our decision making." Ex. 10 at 3.

30. Koninklijke Philips has further advertised that it brought "MRI access to a rural community hospital" in Quitman, Texas. Ex. 10 at 1. ETMC Quitman, also known as UT Health Quitman, is located at 117 Winnsboro St., Quitman, TX 75783 in this District. ETMC Quitman "supports a population of approximately 200,000 Wood County residents." *Id.* at 2. "Identifying an economical solution properly suited for the community hospital environment led ETMC Quitman to choose a Philips Diamond Select Achieva 1.5T" MRI machine. *Id.* at 3. Koninklijke Philips' materials state that ETMC Quitman and Philips had an "existing relationship," which "helped sway the decision in favor of a quality refurbished system." *Id.* Koninklijke Philips' materials state that "Philips initiates a comprehensive five step refurbishment process to ensure quality." *Id.* Koninklijke Philips also promoted the fact that its MRI systems are used in this District and the local nature of its sales efforts, stating "the advantage for local patients is that they are treated to a more personal more attentive experience than they might find in a bigger city," while maintaining "imaging quality [that is] very good." *Id.*

31. On information and belief, in addition to Philips' own regularly provided services in the District at the locations of its MRI systems, Philips also directs and controls the service protocols of third parties contracted to provide services to those MRI systems. On information and belief, employees of Philips' customers, partners, hospitals, and providers, as well as third-party contractors servicing the MRI systems act as agents of Philips when servicing the infringing MRI systems.

32. On information and belief, Philips performs its business in this District via its physical MRI systems in this District, including by executing Philips-developed and Philips-owned

software under contractual terms between Philips and its customers in this District, enforcing Philips' contractual and/or license terms, and transmitting operational and telemetry data to support Philips' MRI machine service business.

33. On information and belief, Philips retains ownership and exclusive control over essential functions of its physical MRI systems in this District, including the proprietary software that operates them, access controls, remote software loading, feature activation, and other functions.

34. In addition, and in the alternative, this Court further has personal jurisdiction over Koninklijke Philips and Philips Medical pursuant to Fed. R. Civ. P. 4(k)(2). MR Access's claims arise under the federal patent laws of the United States. On information and belief, neither Koninklijke Philips nor Philips Medical is subject to general personal jurisdiction in the courts of any single State in the United States. Koninklijke Philips and Philips Medical are foreign entities with principal places of business outside of the United States.

35. The exercise of personal jurisdiction over Koninklijke Philips and Philips Medical under Rule 4(k)(2) comports with due process because Koninklijke Philips and Philips Medical have purposefully directed their activities at the United States; namely, they have placed infringing MRI systems into the stream of commerce, each alone or through subsidiaries, knowing they will be sold and used in the United States. *See supra*. MR Access's claims arise out of and relate to those activities, which economically benefit Koninklijke Philips and Philips Medical.

36. Venue is proper as to Koninklijke Philips under 28 U.S.C. § 1400(b) and § 1391(c)(3). Koninklijke Philips is a foreign corporation and itself or through its affiliates regularly directs business toward Texas residents, including in this District. Koninklijke Philips also conducts business in this District, at least by manufacturing, or directing the manufacture of, products that

it knows and intends will be for sale in Texas, and by selling products and services through its websites, which are accessible in Texas.

37. As described above, Koninklijke Philips also employs personnel in this District and intends and expects personnel to conduct infringing activities, such as selling, servicing, training for proper operation of, and directing the operation of the infringing MRI systems.

38. Venue is proper as to Philips Medical under 28 U.S.C. § 1400(b) and § 1391(c)(3). Philips Medical is a foreign corporation and itself or through its affiliates regularly directs business toward Texas residents, including in this District. Philips Medical also conducts business in this District, at least by applying for FDA approval for products that it knows and intends will be for sale in Texas and this District, and by manufacturing products that it knows and intends will be for sale in Texas and this District.

39. Philips has committed and continues to commit acts of infringement in this District. For example, Philips offers for sale and sells infringing MRI systems in this District. Additionally, hospitals and service providers in this District use Philips MRI machines, including infringing MRI systems and associated coils. On information and belief, Defendants, themselves or through their subsidiaries, direct and control the use of the infringing MRI systems in a specific way so as to infringe and/or instruct their customers and partners to use the infringing MRI systems in their ordinary and customary way, which infringes the Patents-in-Suit.

## BACKGROUND OF THE INVENTIONS

40. Magnetic resonance imaging ("MRI") is a critical diagnostic technology used to detect and monitor a wide range of medical conditions, including cancer, stroke, neurological disorders, and spinal injuries, with high accuracy and without exposing patients to ionizing radiation.

41. MRI systems operate by generating a strong static magnetic field and applying radio-frequency ("RF") pulses to excite hydrogen protons within the body. These RF pulses create a secondary magnetic field, commonly referred to as the B1 field, which perturbs the alignment of the protons. As the protons return to equilibrium, they emit signals that are detected by RF receive coils and reconstructed into medical images.

42. Conventional MRI systems historically relied on single-channel or static RF coil architectures, which function adequately at lower magnetic field strengths but become more electrically lossy and less uniform in transmit and receive at higher field strengths.

43. At higher magnetic field strengths, short wavelength RF fields interfere to produce interference patterns, leading to non-uniform excitation fields and degraded image quality. These technical challenges long prevented the widespread adoption of high-field and ultra-high-field MRI systems for clinical use.

44. Dr. J. Thomas Vaughan, a leading researcher in biomedical engineering and radiology, and his collaborators recognized these limitations and developed solutions that fundamentally advanced MRI technology.

45. To improve the electrical efficiency of RF circuits at higher frequencies, Dr. Vaughan introduced the use of transverse electromagnetic ("TEM") RF coil designs, which replaced traditional lumped-element coils with distributed transmission-line structures. Unlike conventional coils, TEM-based systems allow individual coil elements to be independently controlled, enabling precise adjustment of RF field characteristics.

46. Building on this innovation, Dr. Vaughan and his collaborators developed multi-channel RF transmission and reception systems in which multiple independently controlled channels are used to shape and optimize the RF excitation and/or reception field.

47. This approach, commonly referred to as parallel transmission, allows MRI systems to compensate for RF field inhomogeneity by adjusting the phase, amplitude, frequency, and timing of signals applied to individual coil elements to give optimal RF control over spatial selection.

48. These advancements enabled the development of high-field and ultra-high-field MRI systems, which provide improved signal-to-noise ratio, safe and enhanced imaging capabilities. Parallel transmission and RF field shimming have since become standard features in modern MRI systems.

49. The inventions claimed in the Patents-in-Suit solved fundamental technical problems that had previously limited MRI technology, enabling high-field and ultra-high-field MRI systems, parallel transmission and reception and RF field optimization, real-time tuning and adaptive control of RF systems, and improved image quality and diagnostic accuracy.

50. The ’992 and ’026 Patents disclose, for example, novel adaptive RF control systems and methods, including based on feedback and including using algorithms to determine phase, magnitude, frequency, space or time settings for each coil element. The systems and methods disclosed in the Patents-in-Suit enable parallel transmission and other foundational MR technology.

51. These technologies are now widely implemented in modern MRI systems, including those developed and sold by Defendants.

## THE PATENTS-IN-SUIT

52. MR Access incorporates by reference paragraphs 1–51.

53. MR Access has complied with the requirements of 35 U.S.C. § 287 for each of the Patents-in-Suit.

### A. The ’992 Patent

54. The ’992 Patent, entitled “Parallel Transceiver for Nuclear Magnetic Resonance System,” was duly and legally issued by the United States Patent and Trademark Office on November 29, 2005. A true and correct copy of the ’992 Patent is attached as Exhibit 1.

55. The inventors listed on the face of the ’992 Patent are J. Thomas Vaughan, Gregor Adriany, Kamil Ugurbil, John Strupp, and Peter Andersen.

56. The ’992 Patent is directed to, among other things, novel systems and methods for parallel RF transmission and reception, in which multiple channels independently control RF signals. The abstract of the ’992 Patent explains that the invention concerns “[a]n excitation and detection circuit having individually controllable elements for use with a multi-element radio frequency coil,” in which characteristics of the driving signal—including phase, amplitude, frequency, and timing—are separately controllable and in which feedback for the driving signal associated with each coil element is provided.

57. For example, Claim 16 of the ’992 Patent recites a method including selecting an imaging criterion, configuring a multi-channel transceiver for excitation based on that criterion, delivering excitation to the coil, detecting a plurality of received signals as a function of the excitation, evaluating the received signals as a function of the imaging criterion, and adjusting a selected parameter of at least one independently controllable channel of the transceiver.

58. The ’992 Patent is directed to unconventional, non-routine systems and techniques for performing multi-channel imaging. The ’992 Patent explains that, inter alia, the inventions claimed therein overcame problems in the field. For example, the specification of the ’992 Patent explains that the traditional approach of exciting a monolithic body coil resonator with single channel drive results in non-uniform, lossy, potentially unsafe images; the patent provides the solution to these problems, which is to adjust the RF field in a multi-element body coil per

independent element to optimize or shim the RF field to homogeneity, transmit efficiency and RF safety.

59. The ’992 Patent enabled the first practical implementations of multi-channel transceivers capable of both transmitting and receiving through independently controlled coil elements, solving long-standing limitations in high-field MRI. The inventive systems that were unconventional at the time of the invention have now become commonplace in the industry and standard in Defendants’ MRI systems.

**B. The ’026 Patent**

60. The ’026 Patent, entitled “High Field Magnetic Resonance,” was duly and legally issued by the United States Patent and Trademark Office on September 4, 2018, as a reissue patent. A true and correct copy of the ’026 Patent is attached as Exhibit 2.

61. The inventors listed on the face of the ’026 Patent are J. Thomas Vaughan, Pierre-François Van de Moortele, Lance DelaBarre, Chris E. Olson, Heather Orser, Anand Gopinath, Kamil Ugurbil, Carl Snyder, Gregor Adriany, Can Akgun, Jinfeng Tian, John Strupp, and Peter M. Andersen.

62. The abstract of the ’026 Patent explains that the invention concerns a magnetic resonance system including multiple channels in which each channel is independently configurable with respect to frequency, phase, time, space, and magnitude, and further includes a processor configured to control current in each coil element and perform RF optimization, including shimming.

63. Claims of the ’026 Patent recite systems and methods for configuring and optimizing RF transmission and reception, including selecting optimization criteria, adjusting transmit and

receive parameters across multiple channels, and performing iterative or non-linear algorithms to achieve desired RF field characteristics, such as homogeneity or localization.

64. The ’026 Patent is directed to unconventional, non-routine systems and techniques for performing multi-channel imaging. The ’026 Patent explains that, inter alia, the inventions claimed therein overcame problems in the field. For example, the specification of the ’026 Patent explains that conventional MRI systems are limited at high magnetic field strengths due to RF inhomogeneity and interference patterns, and that the invention addresses these problems by enabling independent, multi-channel control of RF excitation and reception, including dynamic RF field shaping and optimization across multiple coil elements.

65. The ’026 Patent allows for optimization of independent channel pulses such that the industry has been able to achieve more uniform B1 fields, including in ultra-high-field MRIs. The inventive systems that were unconventional at the time of the invention have now become commonplace in the industry and standard in Defendants’ MRI systems.

## DEFENDANTS’ INFRINGING ACTIVITIES

66. MR Access incorporates by reference paragraphs 1–65.

### A. Systems with MultiTransmit RF Technology

67. Defendants’ accused products include, without limitation, 3T MRI systems, such as the MR 7700 3T, Ingenia Elition 3.0T, Ingenia Elition X, Ingenia 3.0T, Achieva 3T TX, and Titanion MR 3.0T, and associated and compatible RF coils, such as the Dual tuned head coil, Smart Fit Knee coil, Flex coil C-140, Flex coil Na-140, and dStream coils (collectively, the “Accused MRI Systems”). *See* Ex. 25. Each of the Accused MRI Systems includes infringing functionalities such as MultiTransmit RF technology.

68. In or around 2008, Philips launched MultiTransmit in 3.0T imaging in Achieva 3.0T TX. Ex. 26 ("Philips was the first company to introduce Multi-Transmit RF to 3.0T imaging in 2008."). Philips further states that "MultiTransmit, with two different RF amplifiers, is standard for Philips 3.0T imaging." *Id.*

69. In or around 2011, Philips launched MultiTransmit 4D in Ingenia 3T. Ex. 27 at 2; Ex. 28 at 11 ("MultiTransmit 4D will become available in the course of 2011."). Philips' materials for MultiTransmit explain that MultiTransmit 4D allowed "the benefits of MultiTransmit technology [to] also be applied to cardiac imaging. New MultiTransmit 4D enables optimal RF transmission even during real-time applications." Ex. 28 at 11.

70. Philips' materials for MultiTransmit parallel RF transmission technology further explain that MultiTransmit "us[es] multiple RF transmit/receive chains and coil elements in parallel" to "significantly improve RF (B1 field) uniformity in high-field MRI." Ex. 29 at 2. Philips further explains that "[t]he individual drive characteristics (e.g. waveform, power, amplitude, phase) for each of the RF sources can be obtained by mapping the B1 field inside the subject produced by each of the independent RF sources." Ex. 29 at 3.

71. Philips states that "MultiTransmit RF technology" is "standard on all Philips 3T MRI scanners." *See, e.g.*, Ex. 30.

72. Philips further states that "[f]or 3.0T systems, dStream delivers consistency and speed with MultiTransmit 4D parallel RF transmit technology." Ex. 31 at 7.

**B. Defendants' Knowledge Of The Patents-In-Suit**

73. On information and belief, Defendants have been aware of the Patents-in-Suit and the fact that the Accused MRI Systems, including use of MultiTransmit RF Technology, practice the

claimed inventions of those patents since at least the launch date of each of the infringing products.

74. On information and belief, members of Philips' Executive Committee are familiar with MR Access's technology and intellectual property portfolio.

75. Defendants and their employees and partners regularly cite the work of Dr. Vaughan and his co-inventors on technology related to the Patents-in-Suit. *See, e.g.*, Brink *et al.*, Passive Radiofrequency Shimming in the thighs at 3 Tesla using high permittivity materials and body coil receive uniformity correction (Philips researchers citing Van de Moortele P-F, Akgun C, Adriany G, Moeller S, Ritter J, Collins CM, Smith MB, Vaughan JT, Uğurbil K., B1 destructive interferences and spatial phase patterns at 7 T with a head transceiver array coil. MAGN RESON MED at 1503–18 (2005)). On information and belief, as persons skilled in the art, the authors would have, or at minimum should have, become aware of Dr. Vaughan and co-inventors' pioneering work.

76. Dr. Vaughan and his co-inventors are leading researchers in the fields of MRI systems and applications, neuroengineering, bioelectronics, bioinstrumentation, biomedical imaging, medical devices, and electromagnetics. For example, Dr. Vaughan has published 150 articles, three books, and eight chapters. Ex. 12 at 1. Dr. Vaughan's articles have been cited thousands of times in other research publications. *See* Ex. 12. On information and belief, as members of the magnetic resonance industry and research space, Philips would have, or at minimum should have, become aware of Dr. Vaughan and co-inventors' pioneering work.

77. As a further example, Dr. Vaughan is a member of the Elected Board of Trustees for the International Society for Magnetic Resonance in Medicine, a Fellow of the Institute of Electrical and Electronics Engineers, and Fellow and Senior Member of the American Institute for Medical

and Biological Engineers. Ex. 12 at 3-4. On information and belief, Philips would have, or at minimum should have, become aware of Dr. Vaughan and co-inventors' pioneering work.

78. As a further example, Dr. Vaughan has been nominated multiple times for the International Society for Magnetic Resonance in Medicine Gold Medal award. Ex. 12 at 3. On information and belief, Philips would have, or at minimum should have, become aware of Dr. Vaughan and co-inventors' pioneering work.

79. As a further example, Dr. Vaughan was a lead engineer for the "first 4 tesla MR system with Philips Forschungslabor Hamburg which was delivered to the University of Alabama at Birmingham in 1990." Ex. 12 at 1. On information and belief, Philips would have, or at minimum should have, become aware of Dr. Vaughan and co-inventors' pioneering work.

80. As a further example, Dr. Vaughan has been credited as a key contributor to the field in presentations and/or publications prepared by other industry members in the field of MRI. As one example, MRI industry presentations have credited Adriany 2005 for the "birth of parallel transmission." *See, e.g.*, https://www.magnetomworld.siemens-healthineers.com/clinical-corner/clinical-talks/parallel-transmission-with-universal-pulses.html, pTx with universal pulses at 1:28. Ex. 13 (1:28 timestamp reproduced below). On information and belief, Adriany 2005 is "Transmit and Receive Transmission Line Arrays for 7 Tesla Parallel Imaging," authored by many of the inventors of the Patents-in-Suit, including Gregor Adriany, Pierre-Francois Van de Moortele, John Strupp, Carl Snyder, J. Thomas Vaughan, and Kāmil Uğurbil. Adriany *et al.*, Transmit and Receive Transmission Line Arrays for 7 Tesla Parallel Imaging, MAGNETIC RESONANCE IN MEDICINE, 53:434–445 (2005). On information and belief, Philips would have, or at minimum should have, become aware of the pioneering work in the field of the Patents-in-Suit of the co-inventors of the Patents-in-Suit.




81. As a further example, Kāmil Uğurbil, one of the co-inventors of the Patents-in-Suit, is the recipient of numerous honors, including "membership in the U.S. National Academy of Medicine and the American Academy of Arts and Sciences, the Richard R. Ernst Gold Medal, the Segerfalk Lecture Award, the ISMRM Gold Medal, the ISMAR Prize, the Koç Award, and the IEEE Medal for Innovations in Healthcare Technology." Ex. 18 at 1. On information and belief, Philips would have, or at minimum should have, become aware of Dr. Uğurbil and co-inventors' pioneering work.

82. On information and belief, in performing research in the MRI space and in performing due diligence in preparing to launch the infringing MRI systems, Defendants would have come across the pioneering work of Dr. Vaughan and his coinventors regarding the technology disclosed and claimed in the Patents-in-Suit. On information and belief, Defendants then did, or at a minimum should have, become aware of the Patents-in-Suit and their infringement of the Patents-in-Suit.

83. Further, Defendants have been and are assignees of a number of patents and patent applications that are related to subject matter similar to the Patents-in-Suit and that were filed

after the Patents-in-Suit were published. On information and belief, in researching the patentability of its own patents, Defendants did, or at a minimum should have, become aware of the Patents-in-Suit.

84. The Patents-in-Suit and their corresponding patent application publications were cited, either by Defendants or by an examiner, during prosecution of Defendants' own patent applications at the United States Patent and Trademark Office. As a person skilled in the art, Philips, upon learning of, reviewing, and/or citing the Patents-in-Suit in the numerous instances set forth below, knew or was willfully blind to the fact that its infringing products practiced the Patents-in-Suit.

85. For example, in a non-final United States Patent and Trademark Office Action correspondence dated March 31, 2009 for Application Control No. 12/089,057, published on October 30, 2008 as US 2008/0265889 (the "'889 Publication"), Philips was notified that "Claims 1, 5–12, 14, 15, 21 and 22 [were] rejected under 35 U.S.C. 102(b) as being anticipated by Vaughan et al. (U.S. Patent 6,969,992) [(the '992 Patent)]." Ex. 32 at 3. After rejection of the '889 Publication over the '992 Patent, Defendants abandoned the '889 Publication. Thus, in pursuing their own patent applications, Defendants learned of the presently-asserted '992 Patent and that the '992 Patent covered their own purported inventions.

86. As further examples, the '992 Patent is cited in other intellectual property belonging to Defendants, such as US 2008/0211501 and US 2014/0055136, issued as U.S. Patent No. 9,535,142. In particular, in the prosecution of U.S. Patent No. 9,535,142, the '992 Patent was referenced as "pertinent to applicant's disclosure." Ex. 33 at 5.

87. As another example, the publication of the application that became the '026 Patent was cited during the prosecution of Koninklijke Philips N.V.'s U.S. Patent No. 7,755,357. Ex. 34.

88. Despite its knowledge of the Patents-in-Suit and of its infringement of the patents, Philips has continued to willfully infringe the Patents-in-Suit so as to obtain significant benefits of MR Access's intellectual property without paying compensation to MR Access. For example, Philips has continued to use the Accused MRI Systems and use the claimed methods without a license, and, on information and belief, has generated billions of dollars in revenue from its infringement. Additionally, after becoming aware of the Patents-in-Suit, Philips proceeded to commercialize new MRI systems and features built on and including the claimed inventions of the Patents-in-Suit without entering into a license to the Patents-in-Suit.

## COUNT I

### (Infringement of the '992 Patent)

89. MR Access incorporates by reference paragraphs 1–88.

90. The '992 Patent was valid and enforceable during the period relevant to this action.

91. Defendants infringed one or more claims of the '992 Patent, literally and/or under the doctrine of equivalents, by making, using, offering for sale, selling, and/or importing into the United States products and methods encompassed by those claims during the term of the '992 Patent, including the accused Philips MRI systems and functionality described above.

92. As one example, Defendants' Accused MRI Systems practiced, and Defendants induced and encouraged others to practice, at least claim 16 of the '992 Patent. For example, on information and belief, use of the Accused MRI Systems requires a method that uses parallel transmission in which signals and parameters are adapted as a function of imaging criteria. As described in Defendants' technical materials, "with MultiTransmit patient-adaptive RF, image uniformity can be obtained in all patients, thereby providing better consistency." Ex. 29 at 8. "By using multiple RF sources, MultiTransmit can adapt the RF signals to each individual patient to improve image uniformity and increase overall imaging consistency." Ex. 35 at 2.

"Each RF source is individually adapted to each patient's unique anatomy and automatically optimized to cancel out the dielectric shading of the other source." *Id.* at 4.

93. For example, use of MultiTransmit RF Technology on the Accused MRI systems includes a method comprising:

a. selecting an imaging criteria (*see, e.g.*, Ex. 29 at 8 ("The use of patient-adaptive RF shimming ensures that optimum RF shimming is used for each patient. Optimum RF shimming precisely realizes the desired flip angle distribution within each patient." . . . "With MultiTransmit patient-adaptive RF, image uniformity can be obtained in all patients, thereby providing better consistency"));

b. configuring a multi-channel transceiver for excitation based on the imaging criteria, wherein each channel of the transceiver is coupled to a respective one of a plurality of current elements of a multi-element radio frequency magnetic resonance coil (*see, e.g.*, Ex. 29 at 3, 11 (describing MultiTransmit RF Technology as an RF transmit architecture "[w]ith two independent RF sources at 3.0T" and stating that MultiTransmit RF Technology uses "independent RF sources and parallel RF transmission"); Ex. 36 at 2 ("All imaging took place on a 70-cm bore 3T MR scanner (Ingenia, Philips Healthcare, Best, The Netherlands) which has a 2-channel transmit system with independent RF control"));

c. delivering excitation to the coil (*see id.*);

d. detecting a plurality of received signals as a function of the excitation (*see, e.g.*, Ex. 29 at 3, 11 (stating that "individual drive characteristics (e.g. waveform, power, amplitude, phase) for each of the RF sources can be obtained by mapping the B1 field inside the subject produced by each of the independent RF sources" and "[t]he process of

obtaining the coefficients with which to drive each of the RF sources, and applying these coefficients during parallel excitation, is known as RF shimming" and further stating that "[w]ith the MultiTransmit architecture of the Achieva 3.0T TX, it is possible to use independent waveforms, phase offset, amplitude scaling and frequency offset during RF transmission (4 parameters per source)" and that "[d]uring reception, independent scaling, phase offset and frequency offset are also possible (3 parameters per channel)"); Ex. 36 at 1 ("exploiting the independent control of transmit amplitude and phase of the 2 RF transmitters"), 2 ("After acquisition of the calibration scan, the complex $B_1$ data was used to set the amplitude and phase settings of the 2 independent transmit channels"));

e. evaluating the received signals as a function of the imaging criteria (*see, e.g.*, Ex. 29 at 2–3 (explaining that the Accused MRI Systems "us[e] multiple RF transmit/receive chains and coil elements in parallel" and other feedback-based processes used to improve transmit field homogeneity and image quality, further stating that the "RF source" is "[t]he combination of independent input signal and RF amplifier" and that "[t]he individual drive characteristics (e.g., waveform, power, amplitude, phase) for each of the RF sources can be obtained by mapping the B1 field inside the subject produced by each of the independent RF sources"), 4 (describing its shimming process per patient as "***performing an in-vivo calibration to determine the required shim parameters***")); and

f. adjusting a selected parameter of at least one channel of the transceiver, each channel controllable independent of any other channel of the transceiver (*see, e.g.*, Ex. 29 at 3–4 (demonstrating "an arrangement" for a "MultiTransmit integrated body coil" where

"two independent RF sources are connected to the independent modes of a standard integrated body coil, thereby realizing a dual-source MultiTransmit RF system," further stating that "[t]he size and positioning of different patients in the MRI system strongly influence the RF shimming coefficients required to obtain the most uniform B1 field inside each subject. It is therefore necessary to adjust the RF shim coefficients per patient. The Achieva 3.0 TX achieves this by performing an in-vivo calibration to determine the required shim parameters"); *see also id.* at 4 (concluding that "patient-adaptive RF shim settings using ***independent transmit sources*** are needed for optimal RF uniformity"); Ex. 35 at 4 ("Each RF source is individually adapted to each patient's unique anatomy and automatically optimized to cancel out the dielectric shading of the other source")).

94. Defendants' Accused MRI Systems therefore implement multichannel transmit in which received signals are evaluated based on testing criteria and channel elements are adjusted independently from one another, as claimed in at least claim 16 of the '992 Patent.

95. Defendants' technical documentation, user manuals, training materials, and marketing materials instruct and encourage customers to generate RF pulse waveform shape, amplitude, and pulse phase to optimize the RF system for each individual patient based on B1 map data, and other parallel transmit workflows that perform the foregoing method. For example, Defendants instruct users to enable in-vivo calibration or optimization features, acquire RF measurements via a calibration scan, evaluate the resulting RF signals to create an RF flip angle (B1) map over the region of interest, and apply "patient-adaptive optimized RF settings using MultiTransmit" based on the B1 map data, thereby encouraging users to perform each step of claim 16. Ex. 29 at 8.

96. Defendants have infringed one or more claims of the ’992 Patent under 35 U.S.C. § 271(a) and (f), either literally and/or under the doctrine of equivalents, by making, using, selling, and/or offering for sale, and/or importing, the Accused MRI Systems either themselves and/or by directing and/or controlling the performance of the claimed steps by third parties selling and/or performing the Accused MRI Systems.

97. In addition, or in the alternative, Defendants have induced infringement of one or more of the claims of the ’992 Patent under 35 U.S.C. § 271(b). Defendants actively, knowingly, and intentionally induced infringement of the ’992 Patent by selling or otherwise supplying the Accused MRI Systems to third parties (such as MRI technicians, hospitals, research universities, laboratories, healthcare providers, and third-party sellers and servicers, including those named above) with the knowledge and intent that those third parties would use the Accused MRI Systems supplied by Defendants to infringe the ’992 Patent. Defendants have acted with the knowledge and intent to encourage and facilitate third-party infringement through the dissemination of the Accused MRI Systems and/or the creation and dissemination of supporting materials, instructions, manuals, guides, and/or technical information related to the Accused MRI Systems, including those cited above.

98. Defendants specifically intended and were aware that the ordinary and customary use of the Accused MRI Systems by their customers and partners would infringe the ’992 Patent. For example, Defendants sell and provide the Accused MRI Systems and compatible coils, which when used in their ordinary and customary manner intended and instructed by Defendants, infringed one or more claims of the ’992 Patent, including at least claim 16. On information and belief, Defendants’ customers and partners include, among others, MRI technicians, hospitals, research universities, laboratories, healthcare providers, and third-party sellers and servicers,

including those named above. On information and belief, Defendants further provided product literature, product manuals, and other instruction materials, including those cited above, that caused their customers and partners to operate the Accused MRI Systems for their ordinary and customary use. Defendants accordingly induced third parties to use the Accused MRI Systems in their ordinary and customary way to infringe, knowing, or at least being willfully blind to the fact, that such use constituted infringement of the ’992 Patent.

99. In addition or in the alternative, Defendants have contributed to the infringement by third parties, such as health care providers or laboratories, of one or more of the claims of the ’992 Patent under 35 U.S.C. § 271(c), by making, selling and/or offering for sale in the United States, and/or importing into the United States, the Accused MRI Systems and/or compatible coils knowing that those products constitute a material part of the inventions of the ’992 Patent, knowing that those products are especially made or adapted to infringe the ’992 Patent and knowing that those products are not staple articles of commerce suitable for substantial non-infringing use.

100. Defendants had knowledge of and notice of the ’992 Patent and their infringement since at least the launch date of each of the infringing products.

101. Defendants’ infringement of the ’992 Patent has been willful and deliberate.

102. MR Access has been damaged by Defendants’ infringement of the ’992 Patent.

103. Defendants’ conduct in infringing the ’992 Patent renders this case exceptional within the meaning of 35 U.S.C. § 285.

**COUNT II**

**(Infringement of the ’026 Patent)**

104. MR Access incorporates by reference paragraphs 1–103.

105. The ’026 Patent is valid and enforceable.

106. Claims of the ’026 Patent are directed to multi-channel RF transceiver systems that use algorithmic optimization to determine phase and magnitude settings for individual coil elements in order to achieve desired RF field characteristics, including uniformity and spatial localization.

107. Defendants have infringed, and continue to infringe, one or more claims of the ’026 Patent by making, using, offering for sale, selling, and/or importing products and/or methods, including at least the Accused MRI Systems, encompassed by those claims.

108. As one example, Defendants infringe at least claim 11 of the ’026 Patent. For example, on information and belief, use of the Accused MRI Systems requires a method that uses algorithmic optimization to determine phase and magnitude settings for individual coil elements while penalizing for parameters such as high SAR levels in order to achieve desired RF field characteristics, including uniformity and spatial localization. For example, the Accused MRI Systems are systems comprising:

a. a radio frequency (RF) transmit coil having a plurality of current elements (*see, e.g.*, Ex. 35 at 4 (explaining that “[b]y using multiple RF sources, MultiTransmit reduces dielectric shading effects” and that “[e]ach RF source is individually adapted to each patient’s unique anatomy and automatically optimized to cancel out the dielectric shading of the other source”));

b. a multichannel transmitter having a plurality of transmit channels, each of the plurality of transmit channels coupling to at least one of the plurality of current elements in the RF transmit coil and being configured for independent selection of at least one of frequency, phase, magnitude, and time (*see, e.g.*, Ex. 29 at 3, 8 (describing the operation of the Accused MRI Systems with “MultiTransmit patient-adaptive RF” as

having a plurality of current elements coupled to a plurality of channels and the use of "***individual drive characteristics*** (e.g. waveform, power, amplitude, phase) ***for each of the RF sources***[, which] can be obtained by mapping the B1 field inside the subject produced by each of the independent RF sources.") (Fig. 3 reproduced below);




*see also* Ex. 37 at 400 (describing MultiTransmit as a "multi channel" option for "RF excitation"));

c. a processor coupled to the multichannel transmitter, wherein the processor is configured to execute instructions to control a current in each element and to perform a non-linear algorithm that implements a non-linear relationship between flip angle and magnetic resonance signal intensity to shim the RF transmit coil (*see, e.g.*, Ex. 29 at 6, 8 (further describing "optimum RF shimming" to "precisely realize[] the desired flip angle distribution within each patient" and explaining "[t]he benefits of MultiTransmit stem from the fundamental improvement in uniformity of the transmitted B1 field inside the patient, which largely eliminates dielectric shading. When the B1 field is uniform throughout the volume of interest then all spins receive close to the same flip

angle. In most MR imaging methods, the contrast behavior depends on the flip angle and sequence timing"); Ex. 38 at 2 (Philips researcher explaining that with additional degrees of freedom, "non-linear inversion techniques are required"), 3 (discussing RF shimming with a "non-linear optimization problem")); and

d. wherein the non-linear algorithm uses a penalty function that returns a value describing a phase and a magnitude for each current element in the RF transmit coil (*see, e.g.*, Ex. 29 at 6, 9 (describing phase values that deviate from "quadrature," and further explaining that the RF shimming process "results in a more uniform flip angle, leading in turn to more uniform contrast sensitivity within the volume of interest"); *id.* at 2 (explaining that its use of MultiTransmit penalizes parameters such as SAR in determining a phase and magnitude for each current element because it "enable[s] RF shimming while also ***minimizing local SAR***"), 4 and 9 (showing their shim parameters as having a phase and magnitude component) (Fig. 4 and 12 reproduced below); Ex. 31 at 7 ("MultiTransmit reduces dielectric shading, helps manage local Specific Absorption Rate (SAR)")).




Figure 4 Patient-adaptive shimming - typical distribution of RF shim settings.




Figure 12 Better uniformity and reduced SAR

109. On information and belief, Defendants' Accused MRI Systems therefore implement multichannel transmit in which phase and magnitude are independently adjusted

based on the systems' non-linear algorithm that uses the non-linear relationship between flip angle and signal intensity to form a B1 map and penalizes parameters such as SAR in determining magnitude and phase, as claimed in at least claim 11 of the '026 Patent.

110. Defendants have infringed, and continue to infringe, one or more claims of the '026 Patent under 35 U.S.C. § 271(a) and (f), either literally and/or under the doctrine of equivalents, by making, importing, selling, and/or offering for sale the Accused MRI Systems either themselves and/or by directing and/or controlling the performance of the claimed steps by third parties (such as MRI technicians, hospitals, research universities, laboratories, healthcare providers, and third-party sellers and servicers) selling and/or performing the Accused MRI Systems.

111. In addition or in the alternative, Defendants have induced infringement, and continue to induce infringement, of one or more of the claims of the '026 Patent under 35 U.S.C. § 271(b). Defendants actively, knowingly, and intentionally induce infringement of the '026 Patent by selling or otherwise supplying the Accused MRI Systems to third parties (such as MRI technicians, hospitals, research universities, laboratories, healthcare providers, and third-party sellers and servicers, including those named above) with the knowledge and intent that those third parties will use the Accused MRI Systems supplied by Defendants to infringe the '026 Patent. Defendants act with the knowledge and intent to encourage and facilitate third-party infringement through the dissemination of the Accused MRI Systems and/or the creation and dissemination of supporting materials, instructions, manuals, guides, and/or technical information related to the Accused MRI Systems, including those cited above.

112. Defendants' technical documentation, user manuals, training materials, and marketing materials, including those cited above, instruct and encourage customers and users to

enable per-patient optimization features, acquire RF measurements via a calibration scan using a non-linear algorithm to create a B1 map over the region of interest, and apply optimized channel-specific transmit settings (the optimal RF amplitude and phase values) based on the B1 map data and with a penalty to limit certain test attributes, such as SAR, thereby performing each step of claim 11.

113. Defendants specifically intend and are aware that the ordinary and customary use of the Accused MRI Systems by their customers and partners would infringe the ’026 Patent. For example, Defendants sell and provide the Accused MRI Systems and compatible coils, which when used in their ordinary and customary manner intended and instructed by Defendants, infringe one or more claims of the ’026 Patent, including at least claim 11. On information and belief, Defendants’ customers and partners include, among others, MRI technicians, hospitals, research universities, laboratories, healthcare providers, and third-party sellers and servicers, including those named above. On information and belief, Defendants further provide product manuals and other instruction materials, including those cited above, that cause their customers and partners to operate the Accused MRI Systems for their ordinary and customary use. Defendants accordingly induce third parties to use the Accused MRI Systems in their ordinary and customary way to infringe, knowing, or at least being willfully blind to the fact, that such use constitutes infringement of the ’026 Patent.

114. In addition or in the alternative, Defendants contribute to the infringement by third parties, such as health care providers or laboratories, of one or more of the claims of the ’026 Patent under 35 U.S.C. § 271(c), by making, selling and/or offering for sale in the United States, and/or importing into the United States, the Accused MRI Systems and/or compatible coils knowing that those products constitute a material part of the inventions of the ’026 Patent,

knowing that those products are especially made or adapted to infringe the ’026 Patent, and knowing that those products are not staple articles of commerce suitable for substantial non-infringing use.

115. Defendants have had knowledge of and notice of the ’026 Patent and their infringement since at least the launch date of each of the infringing products and/or the issuance of the ’026 Patent if after product launch.

116. Defendants’ infringement of the ’026 Patent has been, and continues to be, willful and deliberate since at least the launch dates of the accused products and/or the issuance of the ’026 Patent if after product launch.

117. MR Access has been and continues to be damaged by Defendants’ infringement of the ’026 Patent and will suffer irreparable injury unless the infringement is enjoined by this Court.

118. Defendants’ conduct in infringing the ’026 Patent renders this case exceptional within the meaning of 35 U.S.C. § 285.

## PRAYER FOR RELIEF

WHEREFORE, MR Access respectfully requests judgment in its favor and against Defendants as follows:

A. That Defendants have infringed each of the Patents-in-Suit;

B. That Defendants’ infringement of each of the Patents-in-Suit has been willful;

C. That MR Access be awarded damages adequate to compensate it for Defendants’ recoverable infringement of the Patents-in-Suit, together with prejudgment and post-judgment interest, costs, and disbursements as justified under 35 U.S.C. § 284;

D. That any award of damages be enhanced under 35 U.S.C. § 284 as a result of Defendants' willful infringement;

E. That this case be declared exceptional within the meaning of 35 U.S.C. § 285 and that MR Access be awarded its attorneys' fees, costs, and expenses incurred in connection with this action;

F. That MR Access be awarded either a permanent injunction, or, at least, a compulsory ongoing licensing fee with regard to the '026 Patent; and

G. That MR Access be awarded such other and further relief at law or in equity as this Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff MR Access hereby demands a trial by jury on all issues so triable.

Dated: October 2, 2026

Respectfully submitted,

By *<u>/s/ Paul A. Bondor by permission Andrea L. Fair</u>*

Paul A. Bondor (pbondor@desmaraisllp.com)
Deborah J. Mariottini (dmariottini@desmaraisllp.com)
Pascale S. Boonstra (pboonstra@desmaraisllp.com)
DESMARAIS LLP
230 Park Avenue
New York, NY 10169
Telephone: 212-351-3400
Facsimile: 212-351-3401

Atifah Safi (asafi@desmaraisllp.com)
DESMARAIS LLP
1899 Pennsylvania Ave. NW, Suite 400
Washington, DC 20006
Telephone: 202-451-4900
Facsimile: 202-451-4901

Of Counsel:
Andrea L. Fair
Texas State Bar No. 24078488
E-mail: andrea@millerfairhenry.com
MILLER FAIR HENRY PLLC
1507 Bill Owens Parkway
Longview, Texas 75604
Telephone: 903-757-6400
Facsimile: 903-757-2323

*Attorneys for Plaintiff MR Access, Inc.*